UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

DEVELLA PETERS )
)
V. ) NO. 2:15-CV-217
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act were denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. This proceeding is for judicial review of the Commissioner's decision. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 21]. The defendant Commissioner has filed a Motion for Summary Judgment [Doc. 24].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal*

*Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The plaintiff was at least 50 years of age, or a person "closely approaching advanced age," under the regulations at all applicable times. She has a high school education. The ALJ found that she could return to her past job as a circuit board assembler, but found that her other past relevant jobs were beyond what he found to be her present capabilities. She alleges she became disabled as of August 1, 2011.

Her available medical history is summarized by the Commissioner in her brief as follows:

> The record indicates that Plaintiff received treatment for right knee pain from Mark Griffith, M.D., in March 2002 (Tr. 256). Plaintiff complained of tenderness and localized swelling, which was treated with an injection (Tr. 256). She tolerated the procedure well, and she was instructed to return on an as-needed basis (Tr. 256). Two years later, Dr. Griffith saw Plaintiff again, this time to address pain in both of her knees (Tr. 254). She was diagnosed with degenerative joint disease in both knees and a Baker's cyst in her right knee (Tr. 254). At that time, Plaintiff walked "with a slight antalgic gait," but her neurovascular exam results were within normal limits (Tr. 254). Plaintiff was again treated with an injection and told to return as symptoms warranted (Tr. 254).
> In September 2002, Plaintiff presented to an emergency room complaining of neck pain (Tr. 297). An x-ray revealed mild cervical spondylosis with

2

degenerative disc disease, with no fracture (Tr. 298).

On three occasions in 2009, Plaintiff was prescribed medication to address symptoms of anxiety and depression (Tr. 279-82).

Plaintiff sought treatment from a county health department on December 20, 2011, at which time she complained of worsening neck and back pain (Tr. 301). On physical examination, her back was found to be within normal limits, with some limitations in range of motion (Tr. 301). Treatment notes from before and after this visit indicate that Plaintiff failed to show up for medical appointments on at least three occasions (Tr. 300, 306).

On September 26, 2012, Plaintiff sought treatment for knee and neck pain (Tr. 349-52). She reported that her knee pain had begun 20 years earlier and that she had experienced neck pain for five years (Tr. 350). A nurse practitioner prescribed medication and instructed Plaintiff to return if her symptoms persisted or worsened (Tr. 349, 352).

Plaintiff returned to the county health department for treatment addressing her knee, neck, and back pain on April 19, 2013 (Tr. 369-70). On May 2 and July 8 of that year, Plaintiff failed to show up for follow-up appointments (Tr. 368).

On May 24, 2013, Plaintiff was a passenger in an automobile accident (Tr. 362-66). She suffered moderate pain in her back and neck (Tr. 362). X-rays revealed some disc-space narrowing in her lumbar and cervical spine, but no acute fracture or subluxation (Tr. 363, 365-66). Plaintiff was discharged from an emergency room and instructed to engage in limited activity, including no heavy lifting, for a period of two days (Tr. 364).

On June 17, 2013, Crystal Dyer, M.D., examined Plaintiff to address her musculoskeletal pain (Tr. 394-96). Plaintiff told Dr. Dyer that she had a history of neck arthritis, "but was not having any significant problems" before her auto accident (Tr. 394). In lieu of ordering an MRI, Dr. Dyer referred Plaintiff for physical therapy (Tr. 395).

On June 27, 2013, Plaintiff told her therapist that she had difficulty supporting her head, pushing a vacuum cleaner, opening heavy doors, lifting a gallon of milk, turning her head, and sleeping more than three hours per night (Tr. 382). Plaintiff further informed the therapist that, prior to her auto accident, she had been able to perform all of these activities "independent[ly] and without difficulty" (Tr. 382). Plaintiff ended her therapy after two visits, saying that she was unable to afford the treatment (Tr. 378).

Plaintiff returned to Dr. Dyer on August 12, 2013 (Tr. 391-93). Dr. Dyer's notes indicate that Plaintiff's severity level was moderate and that her symptoms had been relieved by recent treatments (Tr. 391). Dr. Dyer again declined to order an MRI, noting that Plaintiff was "showing signs of improvement" (Tr. 393).

[Doc. 25, pgs. 2-5].

Plaintiff's record also contains various opinions from consultative examiners and

3

State Agency physicians and psychologists. These are summarized in the Commissioner's brief as follows:

> In August 2012, Plaintiff underwent a psychological examination by Anna Palmer, a Licensed Senior Psychological Examiner (Tr. 336-40). Plaintiff told Ms. Palmer that she worked as an insulation installer until she was laid off in the Fall of 2011 (Tr. 336-37). Plaintiff denied ever having received mental-health treatment and stated that she had not taken any medication to address her psychological condition in the last six years (Tr. 337). Plaintiff claimed that she began feeling "depressed and anxious" seven years earlier, when she was going through a divorce (Tr. 338). Results of Plaintiff's mental status examination were normal, and Ms. Palmer noted that Plaintiff's daily activities were not limited by psychological factors (Tr. 337-38). In conclusion, Ms. Palmer opined that Plaintiff could: comprehend and follow both simple and detailed job instructions; maintain adequate concentration and persistence to meet the demands of simple and detailed work-related decisions; interact with others in an appropriate manner; adapt as needed to workplace changes; and protect herself from workplace hazards (Tr. 338-39).
>
> On August 15, 2012, George Davis, Ph.D., a State agency psychologist, reviewed Plaintiff's file, including Ms. Palmer's report (Tr. 62-64, 75-76). Dr. Davis opined that Plaintiff: faced no limitations related to her activities of daily living or social functioning; was no more than mildly limited in her ability to maintain concentration, persistence, or pace; and had never experienced an extended episode of decompensation (Tr. 63, 75). Dr. Davis concluded that Plaintiff's psychological condition was non-severe (Tr. 64, 76).
>
> On August 23, 2012, Marianne Filka, M.D., met with Plaintiff for a consultative physical examination (Tr. 343-48). Plaintiff told Dr. Filka that her neck and back pain was intermittent, and denied that she had ever seen a spine specialist, been to a pain clinic, or received physical therapy (Tr. 343). Plaintiff indicated that her knee pain started 10 years earlier, but that she did not use any assistive devices for ambulation (Tr. 343). Plaintiff told Dr. Filka that she smoked one-half pack of cigarettes per day, had never smoked more than that amount, and had a remote history of marijuana use (Tr. 344). Plaintiff also told Dr. Filka she was laid off from her job in October 2011 and was currently supported by unemployment benefits (Tr. 344).
>
> On physical examination, Dr. Filka found that Plaintiff had full range of motion throughout, including in both knees; full and symmetric strength in both arms and legs; and normal fine and gross manipulative skills, muscle mass, sensation, and gait (Tr. 345-46). Although Plaintiff had some tenderness in her right knee joint, Dr. Filka noted that the rest of her joints were non-tender, and that she observed no swelled joints, joint effusion, or trigger-point tenderness (Tr. 346). Plaintiff could change posture without difficulty, and her spine showed normal range of motion with no deformity (Tr. 346). Dr. Filka opined that

4

> Plaintiff: could lift or carry up to 30 pounds occasionally and 20 pounds frequently; could occasionally squat, stoop, kneel, crouch, crawl, or climb ladders or scaffolding; was unlimited in her ability to climb up and down stairs or ramps; and should avoid operating heavy, vibrating equipment (Tr. 346).
>
> One week later, P. Stumb, M.D., a State agency physician, reviewed Plaintiff's medical file, including Dr. Filka's report (Tr. 64-67, 76-79). Dr. Stumb opined that Plaintiff could: lift or carry up to 50 pounds occasionally and 25 pounds frequently; stand, walk, or sit up to six hours per eight-hour workday; and perform all postural behaviors on a frequent basis, except climb ladders, ropes, and scaffolds only occasionally (Tr. 65-66, 77-78). At the reconsideration stage, Dr. Stumb's opinion was affirmed by James Millis, M.D., another State agency physician (Tr. 92-95, 105-08).
>
> On December 18, 2013, at her attorney's request, Plaintiff was examined by Gordon Hoppe, M.D. (Tr. 398-401). She told Dr. Hoppe that she had experienced increased difficulty walking and standing since 1997, that it had been about six years since she last felt well, but that she was taking no medication of any kind (Tr. 398-99). Plaintiff also told Dr. Hoppe that she last worked in June 2012 as an installation installer and that she quit that job due to knee pain (Tr. 398). In the section of his report devoted to Plaintiff's medical history, Dr. Hoppe indicated that Plaintiff could walk less than one block, climb about eight steps, lift less than 10 pounds, sit for no more than 60 minutes, and stand for less than 10 minutes at a time (Tr. 399).
>
> On physical examination, Dr. Hoppe found Plaintiff's gait was unsteady and her station was forward-leaning, but that she could move to and from a chair or table without difficulty, without assistive devices (Tr. 399-400). Dr. Hoppe noted that Plaintiff's neck had full range of motion, her back was normal, and she displayed full muscle strength in all major muscle groups (Tr. 400). In conclusion, Dr. Hoppe opined that Plaintiff could lift less than 10 pounds, stand or walk less than two hours per eight-hour day, and sit for less than six hours per day (Tr. 400).

[Doc. 25, pgs. 5-7].

The ALJ conducted an administrative hearing on December 20, 2013. The plaintiff's hearing testimony is also summarized in the Commissioner's brief as follows:

> Plaintiff appeared and testified at an administrative hearing on December 20, 2013 (Tr. 27-47). Plaintiff told the ALJ that she was a 52-year-old high-school graduate, and she confirmed her past relevant work (Tr. 30-33). She testified that she suffered from knee, back, and neck pain, for which Aleve was the only medication she took (Tr. 33-35). Plaintiff also testified that she could stand for 15 minutes at a time, and no more than two hours per day, and that she could also sit for two hours per day (Tr. 35-36). Plaintiff stated that she was

5

> depressed "at times," but was not being treated for any mental or emotional issues (Tr. 36). Plaintiff confirmed that her knees had not been x-rayed since 2004. She testified that an auto accident, in which she was involved in May 2013, did not cause knee pain (Tr. 36-37).
>
> In response to questioning from her representative, Plaintiff testified that her neck pain sometimes caused headaches and radiated to her shoulders, and that walking and sitting both aggravated her neck pain (Tr. 37-38). Plaintiff stated that she had trouble climbing and descending stairs, and that her pain made it difficult for her to sleep more than four hours per night (Tr. 38-40). Plaintiff also described how she was able to perform certain household chores, including dishwashing and laundry (Tr. 40-41).

[Doc. 25, pg. 8].

At the hearing, the ALJ called Dr. Robert Spangler, a vocational expert ["VE"] to testify. Dr. Spangler first vocationally classified the plaintiff's past relevant jobs. One of the jobs was as a circuit board assembler, which he described as sedentary and unskilled (Tr. 42). While plaintiff asserts that she could not perform this job, it is undisputed that she cannot perform any other past relevant work.

The ALJ then asked Dr. Spangler a hypothetical question relating to the plaintiff. He asked him "to assume light exertion, assume that she requires a sit/stand option every half hour, assume she can't perform any climbing of ladders, ropes or scaffolds or more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching or crawling. Also no concentrated exposure to vibration. Given those limitations, could she perform any of her past work?" Dr. Spangler responded that she could perform her past relevant work as a circuit board assembler (Tr. 43). It is obvious from reading the transcript that the ALJ was surprised by the VE's response, and was worried that the circuit board assembler job might not pass muster as past relevant work under the

6

regulations. He then asked him if there were other light exertion jobs plaintiff could perform. At the light level, the VE identified a large number of jobs. He then asked the VE to assume all of the restrictions from the first hypothetical, including the option to sit/stand every half hour, but at the sedentary level of exertion. He then asked if the plaintiff could still perform the circuit breaker assembler job. The VE responded "[i]f she had to have a sit/stand every half hour, I would think they would allow that where she could stand and perform the circuit board job." (Tr. 43-44).

At the conclusion of the hearing, the ALJ decided to send the plaintiff for another consultative examination and an x-ray of the knee plaintiff considered her worst one, which she identified as her left knee (Tr. 45-46). The Commissioner arranged to have her evaluated once again by Dr. Marianne Filka, who had previously examined the plaintiff on August 23, 2012. Plaintiff presented to Dr. Filka for the second exam on February 18, 2014. Dr. Filka noted the plaintiff's report of her symptoms, her medications, her prior surgeries, and social history (Tr. 402-404).

On exam, plaintiff was noted to have missing teeth and dental caries, but had normal circulatory and respiratory systems (Tr. 404-405). With regard to plaintiff's extremities, Dr. Filka noted moderate osteoarthritic changes in the fine finger joints and moderate-to-severe bilateral genu valgus (being "knock-kneed"). Plaintiff's strength was 5/5 in both upper and lower extremities including hand grip strengths. Muscle mass was normal throughout. Plaintiff complained of tenderness in both knee joints. Her gait was slow and she used no assistive device. She had a slow gait and showed wear on her shoes

7

laterally and the soles of the shoes. Plaintiff could briefly stand on her toes, do a partial squat, and a one-leg stand on either leg. She had difficulty climbing onto and off the exam table and going from sitting to standing, but did well going from sitting to lying and back again. Other than some tenderness in the cervical curve and soft tissues, her spine was relatively normal with a normal range of motion (Tr. 405).

After noting there were no medical records provided, Dr. Filka stated she "would recommend a sedentary or sit down job where she could be up standing and walking for 5 to 10 minutes per each hour work [sic]. She should not be climbing ladders or scaffolding or working around unprotected heights. She could occasionally climb short runs of stairs or ramps…because of her spine pain and knee pain, she could lift, push, pull or carry occasionally up to 30 lbs., more frequently up to 20 lbs. She should not be kneeling, squatting, stooping, crouching or crawling. I would not put her at other restrictions at the present time based on the history the patient gave me or the physical exam done today." (Tr. 406).

Dr. Filka also completed a medical assessment form (Tr. 407-412). On the form, Dr. Filka stated the plaintiff could sit "at one time without interruption" with "no limit," stand for 10 minutes, and walk for 10 minutes. She opined that the plaintiff could sit with "no limit" to her "total in an 8-hour workday," and could stand for 80 minutes or walk for 80 minutes total (Tr. 408). Dr. Filka stated the plaintiff had "no restrictions" operating foot controls (Tr. 409). She also opined the plaintiff could perform various activities, such as shop, travel alone, walk a block on rough or uneven surfaces, climb a

8

few steps with a hand rail, prepare a simple meal, care for personal hygiene and sort papers or files (Tr. 412).

Plaintiff also had an x-ray taken of her right knee which showed moderate degenerative arthritis in the medial compartment of the left knee with findings suggesting remote spontaneous osteonecrosis in the medial femoral condyle (Tr. 414).

On March 24, 2014, the ALJ rendered his hearing decision. He first described the five-step sequential evaluation process used to determine whether a person is disabled (Tr. 12-13). At step one, the ALJ determines if the plaintiff is engaging in substantial gainful activity. If they are not, the ALJ determines at step two if they have a severe impairment. If they do, at step three, he determines if they meet or equal any listed impairment in the regulations. At this step, the ALJ also determines the person's residual functional capacity ["RFC"]. If the claimant does not meet or equal a listing, the ALJ determines at step four if he or she can return to any past relevant work. If they cannot, then the ALJ must determine at step five whether there are a substantial number of jobs the claimant can perform in the national economy.

After describing the adjudicative process, the ALJ then found that the plaintiff has "the following severe combination of impairments: degenerative changes of the cervical and lumbar spine and degenerative changes of the knees." (Tr. 13). He did not find the existence of a severe mental impairment and discussed the evidence in this regard in considerable detail. Given that the plaintiff does not assert that the ALJ erred in not finding a severe mental impairment, his discussion of that evidence is only notable for his

9

recounting of the consultative exam performed by psychological examiner Anna Whitehead and Dr. Diane Whitehead on August 7, 2012. The ALJ states that "[t]hey noted that the claimant reported that she dusts, sweeps, mops, vacuums, washes dishes, does laundry, and takes out the trash." (Tr. 15 and 338).

The ALJ then stated that the plaintiff had the residual functional capacity ["RFC"] "to perform sedentary work…except: no climbing ladders, ropes or scaffolds; no more than occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to vibration." (Tr. 16).

He then stated that it was his responsibility to determine whether the plaintiff was credible in her statements regarding her functional limitations. He then described her subjective complaints in detail, including taking Aleve for pain and her severe limitations in standing and walking and sitting (Tr. 16-17). He then said that he found that the plaintiff was not entirely credible (Tr. 17).

In this regard, he described the plaintiff's medical records and history with respect to her cervical and lumbar spine impairments and her knees. He stated that the plaintiff has received limited conservative treatment from the Greene County Health Department for neck and back pain. He noted that she had only attended two prescribed sessions of physical therapy because she could not afford them. He noted that her physical exams showed "good strength, negative straight leg raising, and no ongoing neurological deficit." (Tr. 17). He noted that she had not been referred for evaluation by a spine specialist or a pain management clinic, or been hospitalized for spinal problems. He

10

noted again that she took only Aleve for pain.

With respect to her knees, he recounted her treatment in the early 2000's which included arthroscopic surgery of her left knee. He noted x-rays of both knees which revealed serious problems with them both. Again, he noted only conservative treatment and that she only took Aleve for the pain. He said that while plaintiff does experience problems with both her knees and her back, "the record shows that she is able to stand, move about, and use her arms, hands, and legs in a satisfactory manner." Because of this, he found she was not entirely credible (Tr. 17).

He discussed the physical examinations by Dr. Filka on August 23, 2012, Dr. Hoppe on December 18, 2013, and Dr. Filka again on February 18, 2014, describing their observations and conclusions in great detail as set out in the recitation of the medical evidence above. He went into Dr. Filka's latest exam in great detail. He also noted the opinions of the State Agency physicians that plaintiff could perform a limited range of light work (Tr. 18-19).

He then stated he gave little weight to the State Agency doctors, apparently because they found the plaintiff capable of light exertion while the ALJ found plaintiff was only capable of no more than sedentary lifting. Likewise, he gave little weight to Dr. Filka's August 2012 opinion. As was the case with the State Agency doctors, Dr. Filka found the plaintiff could meet the lifting requirements of light work. It is assumed that this is why the ALJ found that opinion lacking in weight. He gave Dr. Hoppe's opinion little weight, finding that his opinion that the plaintiff could stand or walk less than two

11

hours and sit for less than six hours in an eight-hour day was not supported by the other evidence in the case (Tr. 19 and 20).

The ALJ then found that the plaintiff could, as stated by Dr. Spangler, perform her past relevant work as a circuit board assembler. Accordingly, he found that she was not disabled (Tr. 20-21).

At the outset the Court notes, as did the ALJ at the administrative hearing (Tr. 44), that the plaintiff would be disabled under Rule 201.12 of the Medical-Vocational Guidelines which states that a person closely approaching advanced age with a high school education and with a vocational background devoid of transferable skills is disabled even if that person could perform the full range of unskilled sedentary work. With her RFC as found by the ALJ, if plaintiff could not perform any of her past relevant work and the analysis proceeded to the fifth step of the sequential evaluation process, she would be disabled as a matter of law.

Plaintiff asserts first that the ALJ erred by not following the Commissioner's "own rules and regulations in giving proper weight to the opinion of Dr. Filka…" regarding the examination Dr. Filka performed on February 18, 2014, following the administrative hearing.

With respect to Dr. Filka, plaintiff points out that her second examination resulted in an opinion that because of the plaintiff's chronic constant knee pain she recommended "a sedentary or sit down job where she could be up standing and walking for 5 to 10 minutes for each hour of work." (Tr. 406). Plaintiff notes that Social Security Ruling

12

["SSR"] 96-9p states that where an individual needs to alternate the sitting required by sedentary work, and where such a need can't be accommodated by scheduled breaks and a lunch period, "the occupation base for a full range of unskilled sedentary work will be eroded." This SSR goes on to state that "the extent of the erosion will depend on the facts of the case record, such as the frequency of the need to alternate sitting and standing and the length of the time needed to stand."

Here, the ALJ included an option for the plaintiff to sit or stand every thirty minutes in his question to the VE, although he did not include this additional restriction in the RFC finding in his decision. If an ALJ poses a question to the VE which includes functional capabilities greater than those found in the hearing decision, that would be a significant problem. Here, however, the opposite is true. In this case, the ALJ required a sit/stand option every thirty minutes, and the VE testified that the plaintiff could *still* perform her past relevant work as a circuit board assembler even with that additional requirement. This is important in considering the plaintiff's argument regarding SSR 96-9p. The ruling does point out the obvious fact that an RFC for less than a full range of sedentary work indicates very serious restrictions. However, it also states that such an RFC finding "does not necessarily equate with a decision of 'disabled.' *If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work,* consideration must still be given to whether there is other work in the national economy that the individual can do." *Id*. (Emphasis added). Thus, a person who cannot perform any past relevant work can still be found not disabled if a VE

13

identifies a significant number of jobs in response to a hypothetical supported by substantial evidence.

Here the VE testified that the plaintiff *was not precluded* from the performance of her past relevant job as a circuit board assembler. While the Court realizes that plaintiff at her age would be disabled under the Grid rule cited earlier, this language in the SSR shows that VE testimony can support a finding of not disabled even though the job base is eroded. His testimony that she could perform a past relevant job would satisfy the concern of SSR 96-9p just as VE testimony of a significant number of jobs would where the Grid rule was not in play. Dr. Filka's second exam, which came after the questioning of the VE, is not in conflict with the ALJ's hypothetical, and in any event would not have meant, as plaintiff suggests, that the defendant was disabled under that SSR ruling.

The Court understands that the plaintiff interprets Dr. Filka's wording regarding the need for up to ten minutes of standing and walking per hour as being fundamentally narrower than the ALJ's sit/stand option every 30 minutes. However, Dr. Filka's Medical Source Statement of Ability to Do Work Related Activities states plaintiff can sit with "no limit" both at one time without interruption and in an 8-hour work day (Tr. 408). The Court finds plaintiff's expectation of virtually getting up and walking away from the job for ten minutes every hour is not supported by Dr. Filka's second exam opinion. The Court further finds that the ALJ's question to the VE about plaintiff standing up every 30 minutes, if needed, while continuing to perform her job duties is more in line with what Dr. Filka ultimately later opined.

Plaintiff also argues, with respect to the second opinion by Dr. Filka, that the ALJ failed to state what weight he gave to that opinion in violation of 20 CFR § 404.1527.  It is true, as plaintiff points out, that 20 CFR § 1527(c) states that the Social Security Administration "will evaluate every medical opinion we receive."  However, as the plaintiff acknowledges, the ALJ devoted nearly a page of his decision describing the details of Dr. Filka's second examination of the plaintiff (Tr. 18-19).  The Court also believes that the ALJ intended to say that he was giving little weight to both of Dr. Filka's opinions because he states "Little weight has been given to the _assessments_ of Dr. Filka…," but then only mentions the one performed in August of 2012 (Tr. 19).  In any event, the physical findings in the two exams were very similar except for the need to stand and walk which was discussed above.  Also, the exam was not based on a review of medical records, and obviously took into account the plaintiff's subjective complaints.  The actual exam also showed many normal findings, such as 5/5 strength in both upper and lower extremities, normal muscle mass, and a normal range of motion in her spine.  The Court also finds that the ALJ gave little weight to Dr. Filka's opinions in the first exam because he believed the plaintiff was *more restricted* than did Dr. Filka.  Indeed, Dr. Filka opined plaintiff could frequently lift 20 pounds and occasionally lift 30 pounds, while the ALJ believed she was limited to sedentary exertion.  In any event, the ALJ's failure to specifically discuss the weight given to Dr. Filka's opinion of February 18, 2014 was harmless error at best.

The Court also notes that there is other substantial evidence to support the ALJ's

RFC finding, including the opinions that the plaintiff could perform light work by the State Agency physicians. Because he felt the plaintiff was more restricted, he gave them little weight. Their findings nonetheless support the RFC for a reduced range of sedentary work. *See*, 20 CFR § 404.1567(c).

Plaintiff also asserts that the ALJ erred in finding that she was not completely credible. Plaintiff first notes that the ALJ based his opinion on this issue in part on plaintiff's conservative treatment, the fact she was never referred to specialists for her back and knee pain, or undergone surgery for her conditions, and her not having been prescribed anything except ibuprofen or Aleve for her pain. Plaintiff asserts that this does not pass muster under SSR 96-7p. Plaintiff also states that "the most glaring problem with this credibility analysis is the fact that the decision is silent on the weight given to Dr. Filka's February 18, 2014 exam and report when her findings support Ms. Peters credibility and inability to work." [Doc. 22, pg. 13].

Both 20 CFR § 404.1529 and SSR 96-7p require the ALJ to state the basis for his credibility determination. However, it takes more than just the existence of evidence which supports the plaintiff's assertions to challenge an ALJ's credibility finding as long as there is other substantial evidence which supports the ALJ's determination. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 393 (6th Cir. 2010). Also, as the finder of fact, the ALJ is given great latitude with regard to his credibility determination. When he cites substantial evidence in support of his credibility finding, courts may not second-guess him. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012).

Case 2:15-cv-00217-JRG-MCLC Document 32 Filed 08/26/16 Page 16 of 19 PageID #: 552

In fact, the ALJ did list many factors which led him to conclude the plaintiff was not completely credible. With regard to plaintiff receiving only conservative treatment, courts have held that this "suggests the absence of a disabling condition." *Branson v. Comm'r of Soc. Sec.*, 539 Fed. Appx. 675, 678 (6th Cir. 2013). Plaintiff makes the argument that her conservative treatment was the product of her not having health insurance or the financial resources to pay for proper treatment. This is a compelling argument, and the Court sympathizes with her in this regard. However, the treatment providers she did see did not refer her to specialists or state they would have but for her financial situation. Likewise, she failed to keep several appointments with her free medical sources (Tr. 300, 306, 368). Noncompliance with treatment is a legitimate credibility factor for an ALJ to consider. *Robertson v. Colvin*, 2015 WL 5022145, at *6 (E.D. Tenn. 2015).

Regarding plaintiff's argument that Dr. Filka's second exam supports her credibility, and that the ALJ's alleged failure to acknowledge it, the Court notes that the ALJ utilized the same restrictions opined by Dr. Filka in his finding that the plaintiff could only perform a reduced range of sedentary work. Neither of Dr. Filka's opinions suggests plaintiff can do no work whatsoever. Also, as stated above, the exams indicated 5/5 strength in all extremities and a normal spinal range of motion. Such objective findings can certainly be found to be inconsistent with the plaintiff's statements that she is totally disabled. In any event, Dr. Filka's second exam, like the first, does not militate against the ALJ's finding that the plaintiff was less than fully credible.

Also, conservative treatment and taking only over-the-counter medication was not the only basis given by the ALJ for finding her not completely credible. Besides this, the plaintiff's activities of daily living discussed by the ALJ (Tr. 14 and 15) do not support her claim of total disability. She also claimed that her disability began on August 1, 2011, but after a car wreck two years later, she stated she had not had "significant problems" before the wreck (Tr. 394). Also, the plaintiff told Dr. Filka at the August 2012 visit that she was receiving unemployment benefits (Tr. 344). The Court understands that the plaintiff was in legitimate need of any income, but it is incongruous to draw unemployment and simultaneously claim to be totally disabled. As the Sixth Circuit has more than once said "[t]here is no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.'" *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801-802 (6th Cir. 2004) (quoting *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Also, the many normal or near normal exam findings from the examining sources detract from the plaintiff's subjective complaints and her claim of total disability.

The ALJ gave compelling reasons for his credibility finding. His findings are supported by substantial evidence. Therefore, as stated earlier, this Court is not entitled to "second-guess." *See, Ulman, supra*.

This is a difficult case in a great many respects. The plaintiff has severe and profound limitations. However, there is substantial evidence to support the RFC finding,

18

and the VE testified, to the ALJ's surprise, that even with her serious limitations she could perform her past relevant work as a circuit board assembler with that RFC. The ALJ did not determine in advance that there would be an unfavorable result for the plaintiff and then machinate the proceedings towards that goal. He instead followed the evidence and the testimony to his ultimate conclusion that plaintiff is not disabled. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 21] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 24] be GRANTED.[1]

Respectfully submitted,

   s/ Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).